# EXHIBIT E

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of Arbitration ) | |
| ) | |
| Between ) | |
| ) | OPINION and AWARD |
| IUOE LOCAL 25 ) | |
| ) | Case No. 01-17-0004-6251 |
| and ) | |
| ) | |
| CASHMAN DREDGING/MARINE ) | |
| Contracting CO., LLC ) | |
| ———————————————————— ) | |

The undersigned was appointed by the American Arbitration Association as Arbitrator of the dispute described herein.

The hearing was held on February 16, 2018 at the New Jersey State Board of Mediation, Newark, New Jersey. The parties had full and fair opportunity to present evidence and argument, to engage in the examination and cross-examination affirmed witnesses, and otherwise to support their respective positions. The parties agreed to the framing of the issue and the record was deemed closed on April 6, 2018 upon receipt of the parties' closing briefs. When the Union objected in writing on April 11, 2018 to some of the arguments in the Company's closing brief, the Company was permitted to respond, which it did by the date required, April 23, 2018 and the Award due date was extended to May 24, 2018.

<u>BEFORE</u>: Mattye M. Gandel, Arbitrator

<u>APPEARING FOR THE UNION</u>:

Kenneth I. Nowark, Esq.
Zazzali Fagella Nowark Kleinbaum & Friedman

<u>APPEARING FOR THE EMPLOYER</u>:

Charles S. Einseidler, Jr., Esq.
Jeffrey E. Francis, Esq.
Piece Atwood, LLP

<u>ISSUE</u>:

Is the matter arbitrable and if so, did the Employer have just cause to terminate the Grievant, Peter Gibson? If not, what shall be the remedy?

BACKGROUND:

Cashman Dredging and Marine Contracting Company, LLC (Company/Employer) and International Union of Operating Engineers, Local 25, Marine Division (Union) are parties to a Collective Bargaining Agreement (Agreement) entered into the record of the hearing as Joint Exhibit J-1. The matter herein arose as a result of the termination of the Grievant. The parties were unable to settle the dispute through their grievance procedure. Hence, the Union has submitted same to this Arbitrator for a final and binding decision.

POSITIONS OF THE PARTIES:

The Employer's position is that Section 33 of the Agreement provides for the processing of Grievances; that the Union failed to comply with any of its requirements and that, therefore, the matter is not arbitrable because no Grievance was filed and because the filing for arbitration was untimely. Further, there was no evidence that the Grievant filed a Grievance and even if the Union filed one on his behalf, this does not cure his failure. Furthermore, the evidence that the Union filed a Grievance is not credible. The Union's initial filing with the American Arbitration Association (AAA) did not refer to a Grievance and no Grievance was submitted as a potential joint exhibit.

Executive Vice President Frank Belesimo testified that he never received a Grievance in this matter; that he had at least two conversations with Union officials after the termination in which he made it clear that the decision would not be reversed; that he did not agree to any waivers of the

process and that at no time did the Union ever mention a Grievance having been filed or the lack of an answer. Though the Company received an email on July 17, 2018, which suggested that the Union was unilaterally going to decide if it was going to "skip" the steps in the arbitration process, the Union made no reference to a Grievance. Further, the reference to skipping the steps of the arbitration process appears in Section 33, paragraph 2 and is only applicable if a Grievance has been filed, which did not happen in his matter. Rather, at the arbitration hearing a letter dated July 6, 2017, purported to be a Grievance letter, with no cover email was presented for the first time and it was only after the hearing that a cover email dated July 6, 2017 was submitted to the Arbitrator. In response, the Company conducted a search of its email servers from Union President Jerry Abell's jaloc25tpa@aol.com email account and, according to Belesimo's sworn affidavit signed March 29, 2018, two emails came from this account but neither one had an attachment and there was no record of a July 6, 2017 email. Though the Company requested further information from the Union regarding this email, it concluded that the July 6th email was never sent or received because the Union refused to provide this requested additional information because it claimed that one of the recipients on the email string received the email and attachment and, therefore, it would have been received by the Company. However, it is the Company's position that it did not receive the July 6, 2017 Grievance and that the matter is not arbitrable because no timely

Grievance was filed by the Grievant and by the Union though both were required to do so by the terms of the Agreement.

Additionally, the Company asserts that the filing for arbitration was untimely; that under the terms of the Agreement, Article 33, Section 5, only the Union or the Company can file for arbitration and that that right must be exercised within thirty (30) days of the notice of the issue to be arbitrated; that the Company was not given advance notice that the Union was proceeding to arbitration and that the arbitration filing was past the thirty (30) day requirement and, therefore, untimely. The Grievant was terminated on June 30, 2017 but the Union did not file for arbitration until August 2, 2017, two days after the July 31, 2017 deadline, and the arbitration filing was not even emailed to counsel for the Company until after the close of business on August 2, 2017. Finally, the Union did not request an extension for the arbitration filing and the Union cannot take it upon itself to unilaterally amend the Agreement or to grant itself an extension of the filing time and, therefore, the demand for arbitration was untimely and the matter not arbitrable.

When the Union submitted an objection to the AAA on April 11, 2018 regarding some of the Company's arguments in its closing brief, the Company was given an opportunity to respond by April 23, 2018. Specifically, the Company's position in its April 23, 2018 email further supporting its claim that the matter was untimely and not arbitrable is the fact that the Grievant did not present a Grievance in writing within seven days as was the required first step of the Grievance procedure and the Union

does not contend that he did. Further, it was only late in the arbitration hearing that the Union claimed to have submitted a Grievance despite the fact that the Union was on notice since the August 18, 2018 email to AAA and Union counsel, which stated that the Company was reserving its right to claim that the matter was not arbitrable.

Moreover, Belesimo was unambiguous that he had never received a Grievance from the Union and searched his email account to confirm that the purported transmission from Abell was never received. Additionally, the Company cites the fact that Abell's July 17, 2017 email to Belesimo advised the Company that the Union was going to unilaterally skip the required steps of the Grievance procedure and move to arbitration. Further, when the Company requested production of system metadata from the Union to prove, as is required by the Federal Rule of Procedure, that in fact it submitted a Grievance on July 6, the Union refused to produce such information to authenticate the email.

Finally, in response to the Union's questioning of Belesimo's affidavit of his search of the Company's computer systems for any evidence that the Union's email was received by the Company, the Company submitted an affidavit from Stephen Hemsworth, the computer professional who personally searched the Company's computers and email, and found no evidence that the July 6 transmission was ever received.

As to arbitrability, the **Union's position** is that Abell testified that he emailed Belesimo a letter on July 6, 2017, U-1, clearly stating that the Union was grieving the termination; that the Union presented the cover email that showed that it was sent to Belesimo on that date and that the burden

of proof that an issue is not arbitrable is upon the Company. Further, it is the Union's position that the email was sent to Belesimo and to Union Vice President Pero; that the email addresses were correct; that Pero provided proof that he received the email and the attachment and that, therefore, the Grievance letter was timely filed.

Moreover, the conversations between the parties between June 30 and July 5, 2017, testified to at the hearing, show that the Company and the Union both knew that the Union was going to grieve the termination, knew the Grievance would be denied and knew it would end up in arbitration. Even without a written Grievance it was evident from the testimony of the Company and Union witnesses that the Union was going to file a Grievance and proceed to arbitration. In fact, Abell sent an email on July 17, 2017 asking to skip the steps of the Grievance procedure and move to arbitration. Without any showing of prejudice to the Company, the Grievance cannot be deemed so procedurally defective as to remove the matter from the Arbitrator and to deny the Grievant his opportunity to be reinstated.

The Union contends that, unlike other Grievance procedures, there is nothing in this Agreement that makes every step an absolute prerequisite for further action. There is no language that says that if a step is missed, the Grievance is denied or that the Union is barred from proceeding to arbitration and there is no language that prohibits any extension of time to file at any step. In sum, there is no bar in the Agreement that would preclude taking this case to arbitration and, therefore, the Union did comply with all of the Grievance procedures. It is the Union's opinion that the Company did not meet its burden of proof that the case is beyond the Arbitrator's jurisdiction to resolve.

Finally the Union's April 11, 2018 letter to AAA cited objections to the Company's initial closing brief and asked this Arbitrator to disregard the objectionable materials and arguments. The assertion that a written Grievance was not timely submitted was addressed during the hearing and the Company never offered the records analysis in Belesimo's affidavit and accompanying exhibits at the hearing but rather offered this information after the close of the hearing. In a prior instance in this matter, the Arbitrator denied additional evidence and ruled that the matter was closed on February 16, 2018. Therefore, she should not accept this additional Company information as it was known at the time of the hearing and should be stricken as untimely.

Further, the Union asserts that Belesimo's affidavit is hearsay as it was a second hand account of the search and its supposed results, did not state that the Company had advanced archiving capability, did not state the scope or efficacy of the software search, did not reveal the searcher's identity or search techniques or competency to conduct the search and was not subjected to cross examination.

In contrast, at the hearing an interview was held telephonically with Abell, who stated that the Union submitted a timely and proper Grievance and, in response to the Arbitrator's request, the Union submitted a copy of that email showing that it was sent to Union Vice President, Alan Pero and Belesimo. It is the Union's position that Abell's email with the attached Grievance was received by at least one other recipient. However the Company now asserts, without any direct testimony, built upon an inadequate foundation, that it never received the letter. Therefore, the Union contends that Exhibits 1 and 2 in the Company's closing brief were untimely, constitute hearsay and lack a proper foundation and should be stricken

along with any reliance thereon that was argued in the closing brief. Finally, the Union asks this Arbitrator to strike Exhibits C and D of the Company's brief as they are double hearsay, lack any foundation and do not prove or disprove that the Union's duly-issued Grievance reached the Company.

As to the merits, it is the **Company's position** that the Grievant was terminated for threatening communications with Company employees and because he was complicit in, benefitted from and failed to report his wife's fraudulent wire transfer. The Company asserts that there was not one scintilla of admissible, competent evidence to rebut the fact that tens of thousands of dollars were deposited in the Grievant's joint account after the fraudulent wire transfer; that the Grievant and his wife remained as thick as thieves in constant contact at all times relevant; that the Grievant proceeded with a lavish spending spree buying cars, trucks, a RV, a motorcycle and a new home and that the Grievant admitted that "what's mine is hers and what's hers is mine." Finally, it is the Company's position that though the Grievant admitted to have been offered employment opportunities, he did not accept any offers; that there was no evidence that his employment with the Company was hard to replace with other gainful employment and that, in contrast, Company witnesses testified that there are tremendous opportunities for employment in the dredging industry.

Therefore, the Company asks this Arbitrator to deny the Grievance as untimely but if it is determined to be timely, to determine that the Company had just cause to terminate the Grievant and to deny the Grievance.

As to the merits, it is the **Union's position** that the termination letter lists several

bullet points, which were not attributed to the Grievant but which were about his wife's actions; that the Company could have named the Grievant as a co-conspirator in the suit but did not; that though the Company cited the number of phone calls the day of the wire transfer, a review of their calls revealed that they made frequent calls each day even before the wire transfer and that the Grievant denied in those phone conversations that his wife told him the issue of the wire transfer. The Union asserts that while the Company relied on the wife's memory, it had an obligation to convince this Arbitrator beyond a reasonable doubt that there was no question of his own guilt, which the Company has not done.

Further, the Union asserts that while the Company concluded that the unexplained deposits were $60,000, in reality they added up to approximately $45,000 or even $17,000, far below the amount claimed by the Company. Additionally, these unexplained deposits were in relatively small amounts and some are for the exact amount of a payment of a bill that same month.

Of importance to the Union was the fact that there was no evidence that the Grievant should have suspected his wife about a fraudulent wire transfer; that she did not tell him about the wire transfer and that all he knew was that her computer had been hacked. It is the Union's position that the Company cannot conclude that the Grievant was complicit because three years later his wife could not remember her calls on that day, because of odd deposits of money after the sale of the house or because of deposits made a year or two later or because the Grievant did not connect a deposit in 2016 to the 2014 wire fraud.

It is the Union's position that the Company has terminated the Grievant because of his wife's actions, not his. There is no evidence of an excessive number of phone calls on August 22; there is no evidence that his wife ever told him she engaged in any type of fraudulent wire transfer, there is no evidence of a major influx of money into their joint accounts after the wire transfer, there is no evidence to link any fraudulent monies to the Grievant and no evidence of conspicuous consumption. All the evidence is against the Grievant's wife, not the Grievant and is hardly the basis to uphold a termination for theft.

Finally, the Company did not conduct any investigation of the Grievant and did not meet its burden of proof, which is required.

Therefore, the Union asks this Arbitrator to sustain the Grievance and to reinstate the Grievant will full back pay and benefits.

OPINION:

Section 33 of the Agreement, Arbitration, states in pertinent part that

All complaints, disputes or grievances arising between the parties hereto, relating
to, or in connection with, or involving questions of interpretation or application of
any clause of this AGREEMENT, . . . shall be processed pursuant to this section. .

. .
1. Any employee covered by this AGREEMENT who alleges the existence of such a dispute must present his grievance, in writing, to the Vessel Captain or appropriate Supervisor and the UNION within 7 working days of the date of the occurrence which is the subject of the grievance. The UNION shall transmit the grievance to the COMPANY within 7 working days. The COMPANY shall answer the grievance in writing within 10 business days after receipt of the written grievance submitted to the

COMPANY by the UNION. The COMPANY shall provide this written response to both the grievant and the UNION.

2. If the grievance is not satisfactorily resolved on the basis of the COMPANY's answer, the UNION, in its sole discretion, may submit the matter to the Quick Dispute Resolution Committee (the "Committee") or to arbitration as set forth below, or determine not to pursue the grievance further. If the UNION submits the matter to the "Committee" or arbitration, it must do so in writing sent within ten 10 business days of receipt of the COMPANY's answer pursuant to subsection (1).

3. . . .

4. If the UNION files for arbitration, it shall do so to the American Arbitration Association. . . The parties may agree to extend the time limits set forth in subsection (3).

5. The UNION shall have the authority to file for arbitration on behalf of a group of employees . . . within thirty 30 calendar days of discovery of the issue. Within that 30-day period, and prior to filing for arbitration, the party with the grievance must notify the other party of the issue in writing.

6. . . .

7. The decision of the arbitrator shall be final and binding upon both the UNION and the COMPANY. . . . The arbitrator shall have jurisdiction and authority only to interpret and apply the provisions of this AGREEMENT with respect to the controversy being arbitrated, and shall not have the authority to add to, detract from, alter, or amend any of the provisions contained herein. In the event one party alleges that the other party failed to comply with the procedures in this section, the arbitrator shall determine the issue.

As to the arbitrability issue, the Company contended that the Grievance was untimely because the Union failed to comply with the terms of the Grievance/Arbitration procedure, Section 33 of the Agreement, in three respects.

o The employee must present his grievance, in writing, to the Company and to the Union within seven working days of the occurrence.

o The Union shall transmit the Grievance within seven working days to the Company.

o The Union shall have the authority to file for arbitration within 30 calendar days of the occurrence and must notify the Company in writing within that 30-day period and prior to filing for arbitration.

It was undisputed that two of the above requirements were not fulfilled. The Grievant did not file a Grievance in writing and the Union did not file with the AAA until August 2, 2017, J-2, which was beyond the 30-day calendar limit, and did not notify the Company prior to filing for arbitration.

Belesimo's undisputed testimony was that he called Pero as a courtesy to let him know before he spoke to the Grievant, so he would not be blindsided; that he was planning to suggest to the Grievant that he leave on his own and that the Company was going to give him two weeks severance. Further, Belesimo spoke to the Grievant and gave him the Company's offer, which the Grievant declined. Thereafter, the Grievant was terminated on June 30, 2017 and received a letter, J-3 dated July 5, 2017, via email and overnight mail, outlining the reasons for the termination. Further, Abell confirmed Belesimo's testimony that Abell, Belesimo and Pero spoke about the termination on June 30, 2017; that the Union was told that the Company offered the Grievant money, which he turned down, and that the Company was not going to change its mind. According to Abell, it was Belesimo who suggested that the Union not go through the grievance steps because the Company was not going to change its mind.[1] Both Abell and Belesimo agreed that Abell said the Union was going to file a Grievance. Further, Belesimo testified that he did not recall waiving the steps of the grievance/arbitration process and that he would never have done that because he would have had to talk to management before agreeing to skip the steps.

---

[1] In what appeared to be different from his testimony, Abell wrote in an email dated July 17, 2017 to Belesimo, part of C-2, that "as I mentioned in our phone conversation I guess we will skip the other steps of the arbitration section and go straight to Local 25 (sic) position as to whether I as Business Manager decide if it should go to arbitration or no." Therefore, it is not clear which party suggested skiing steps.

Abell testified telephonically at the hearing that he emailed a letter to Belesimo dated July 6, 2017, U-1, in which he stated that

> This letter is the initial notification . . . of a grievance being filed on behalf of Mr. Peter Gibson. . .
> As per our phone conversation . . . you stated that you would accept this notification via email due to your travel schedule . . and I agreed to mail a copy to your office in Qunicy, MA.[2]

However, according to Belesimo, he never received this Grievance.

Because U-1 was a single sheet of paper, with no proof that it had been emailed to Belesimo, the Arbitrator asked Abell at the end of the hearing if he could find the email cover sheet. On February 20, 2018, the Union forwarded an email containing the requested information to the Arbitrator and to Company counsel, which showed that an email was sent on July 6, 2017 from Abell to Belesimo and Pero. Thereafter, the Company conducted a search of its email files from June 1, 2017 to August 31, 2017 to determine if in fact Belesimo had received an email from the Union dated July 6, 2017, U-1. After its search, the Company sent the Arbitrator and Union counsel an email dated March 6, 2018, which included a listing of all the emails sent and received by the Company during this time period and explaining its research, and concluded that the Company did not receive any email from Abell dated July 6 and, though it received two emails from Abell during this time period, one dated July 17 and the other dated July 18, neither one of these had an attachment. Thereafter, Union counsel forwarded the Arbitrator and the Company's attorney an email dated March 9, 2018, which indicated

---

[2] The letter, U-1, was addressed to Belesimo in Quincy, MA 02169 and his email address was correctly noted as FBelesimo@jaycashman.com.

that an email had been sent from Abell to Belesimo and Pero on July 6, 2017. The Union claimed in its initial brief that Pero confirmed that he had received the email and attachment and that if Pero received the email, Belesimo had to have received it also.

Belesimo testified that he advised Abell on July 17, 2017, C-2, in response to his inquiry, that all correspondence in this matter should go to the Company's attorney and that he did not hear from the Union until August 3, 2017 when he learned from the Company's attorney, that the Union had filed for arbitration.

Although the Company argued that the filing of the Grievance/Arbitration was deficient in three areas, the main issue of contention between the parties regarding timeliness was the fact that it was the Company's position that it never received a Grievance from the Union as required by Section 33, item 1.

It was undisputed that the Company notified the Union in an email exchange with AAA and Union counsel on August 18, 2017, part of Exhibit A of its initial closing brief, that

> We make this submission without waiving and expressly reserving the Company's position that both the grievance filing and arbitration demand are untimely.

Therefore, within sixteen (16) days of the Union filing for arbitration, the Company made clear its position regarding arbitrability. At the hearing, the Company continued to claim that the matter was not arbitrable and proposed that the first issue to be decided was whether the matter was arbitrable. The parties agreed on the statement of the issue.

Upon receiving the Company's brief, the Union sent a letter to AAA objecting to

four points in the Company's initial brief. The Union's initial objection was that because the Arbitrator denied the Union's request to include further evidence after the close of the hearing, she should similarly disregard Exhibits 1 and 2, part of Exhibit B, and Exhibits C and D of the Company's closing brief. However, this Arbitrator does not agree that these requests are similar.

In the first instance, although the Union was aware since the Grievant received his termination letter dated July 5, 2017, J-3, of the issue to be decided, specifically the unexplained deposits in the Grievant's joint bank account, at the end of the hearing on February 16, 2018 the Union asked for another day to present more evidence about the unexplained deposits, despite the fact that the Grievant had given extensive testimony for several hours about his financial transactions. This request for another day of hearing was denied and the matter was closed except for a request from the Arbitrator at the hearing for supporting documentation from Abell regarding the Grievance. Additionally, on March 15, 2018, the Union asked again to submit more evidence on the unexplained bank deposits and what the Company knew at the time of discharge and that request was denied because the matter was closed and the record was "clear, detailed and extensive; both parties given the opportunity to present all the testimony and evidence; . . ."[3]

In contrast, the Union is now objecting to four exhibits included in the Company's initial closing brief and requesting that they be similarly rejected because the hearing was closed. However, this Arbitrator cannot agree that the requests are the same.

---

[3] Email from AAA to the parties dated March 20, 2018 as directed by the Arbitrator.

Several factors must be considered. First of all, in response to the Arbitrator's information request of Abell at the end of the hearing, Union counsel forwarded information it contended proved that Abell sent Belesimo an email and attachment dated July 6, 2017. In response to that assertion, the Company reviewed its email file and determined that no email dated July 6, 2017 with an attachment had been received by Belesimo and so advised the Union and the Arbitrator with supporting documentation. Therefore, Exhibit B, items 1 and 2 had already been supplied to the Union and Arbitrator via email dated March 6, 2017 and the Union had responded to the March 6 email on March 9, 2017 by claiming that "Mr. Pero confirmed that he did in fact receive the email and attachment." All of this information was in direct response to the Arbitrator's request to Abell and was properly rounding out the testimony i.e. Abell sent documentation that he sent the email on July 6 with the attached Grievance and the Company responded by searching its email data base and concluding that the research showed that the Company did not receive that July 6, 2017 email from Abell.

The information in Exhibits B, C and D were not a result of the Company requesting to open the record and present more information. Rather, in the opinion of this Arbitrator, the March 6, 2017 email including the results of the Company's research into its email data base was a direct response to the Union's position that it had sent the Grievance in a July 6, 2017 email to the Company and a direct response to the Arbitrator's request for confirmation that the July 6, 2017 was actually sent. Further, while it is accurate that the Company did not submit the research on its email date base at the hearing, it did not know at that time that the Union was going to submit proof that it had sent the Grievance dated July 6,

2017 via email to Belesimo and it was only after the Arbitrator asked for substantiating evidence at the end of the hearing and when the Union submitted its proof that the email was sent, that the Company researched its files to see if it had received that email. This information in the Company's initial brief was not new information but was information the Company had provided the Union and Arbitrator by email on March 6, 2017 before the initial briefs were submitted on April 5, 2018.  Finally, while the Union asserted that Belesimo's affidavit was hearsay, the same can be said for Pero's statement to Union counsel outside the hearing that Pero had received the email and attachment dated July 6, 2017.

Arbitrators are very reluctant to conclude that an issue is not arbitrable as it is very important for the parties to receive a decision on the merits of a matter so that the parties can resume their main task of operating the business. On the other hand, these parties have negotiated specific language in the Grievance/Arbitration article and have a right to have that language applied. Arbitrators attempt to decide that a matter is arbitrable, if at all possible, so that the Grievant does not forfeit his/her right to be heard on the merits. This Arbitrator cannot explain why the search of the Company's email data base revealed that an email dated July 6, 2017 from Abell was not received by Belesimo when the Union provided the caption on the July 6, 2017 email that it was sent on that date. Therefore, this Arbitrator is left with the fact that both sides have plausible positions on whether the Grievance was sent/received. Given that there is an unanswerable question regarding the receipt of the document, this Arbitrator must

conclude that the Company did not meet its burden to prove that the matter is not arbitrable.

As to the merits, the Grievant was terminated as per J-2

> because of your threatening communications with Company employees regarding the litigation and the fact that you were complicit in, benefitted from, and failed to report the fraudulent wire transfer.

All Company witnesses testified that the Grievant was a "good guy" and that they liked him. However, the Company became concerned abut the Grievant's involvement in the wife's fraudulent wire transfer when he inserted himself into the matter by making threatening calls to management. Two members of management stated that the Grievant called him regarding the lawsuit against his wife, Wendy Gibson. Robert DeCrescenzo testified that the Grievant called him two times in the evening, once one month after the lawsuit was filed and once about one to two months later. In the first call the Grievant asked why the Company was suing his wife and in the second call he again asked why the Company was suing her. However, DeCrescenzo testified that by that second call the Grievant would have known what the suit was about because the papers had already been served. Further, DeCrescenzo testified that he received a text after the second call, which simply said "game on," and which he said "sounded like a threat, like he was coming after me."  As for the availability of work for the Grievant after he was terminated, DeCrescenzo testified that the Grievant has skills for other work; that other companies are very busy and hiring and that employees leave and go back to work at another company the next day.

Additionally, Richard Barber testified that the Grievant called him and said that

Barber was involved because of tax reasons; that he did not understand what the Grievant meant and that he did not explain the connection between the lawsuit and taxes but Barber believed that the Grievant was threatening him because he, the Grievant, thought that Barber was part of the lawsuit. While Barber did not remember when the conversation occurred, he believed it was after the lawsuit had been filed. Further, Barber confirmed that the Grievant's wife, as the Comptroller for the Company, took out taxes from his pay for payroll but otherwise did not know how she would have known about his taxes.

In response to these accusations, the Grievant acknowledged that he spoke to DeCrescenzo on July 15 or 16, 2016, the day the package with the lawsuit was delivered. However, though the Grievant stated that he spoke to Barber three to six times a day and admitted calling him after his wife received the lawsuit, there was no threat about taxes and he denied talking to him about taxes. Further, when asked about his comment, "game on," the Grievant stated that that referred to a sporting event. However, taking the testimony of the two Company witnesses and the Grievant into consideration, this Arbitrator was convinced the Grievant was not credible.

The record established that the Company filed a lawsuit against the Grievant's wife for embezzling $198,000 dollars in August 2016 but the Grievant was not named in the suit. However, during the wife's trial, it became clear that the funds went into joint accounts. Because the Company believed that the Grievant was complicit with, benefited from and failed to report the theft, and because of his threatening calls/text to two members of management, he was terminated on June 30, 2017.

Credibility is key to a determination in this matter. It was undisputed that the Grievant's wife committed a fraudulent wire transfer from Sterling Equipment, Inc., a company directly affiliated with Cashman. The Company asserted that after the fraudulent wire transfer, which went into the joint accounts, the Grievant went on an extensive buying spree including buying cars, a house, a RV and motor cycles and claimed that neither the Grievant nor his wife could adequately explain the deposits in their joint account. During the extensive examination of the Grievant, who was a lead dredge man for the Company, he detailed his years of work with the Company, the many transfers of location, the times he was married to his wife and the times they were divorced and the houses they bought in each location.

The Union claimed that the Company never interviewed the Grievant and never got his side of the story about the funds that were deposited in the joint bank accounts. However, it was undisputed that Belesimo spoke to the Grievant before he was terminated and told him what was going on and what the Company was offering and the Grievant admitted that Belesimo told him this was about his wife's court case. However, the Grievant did not accept the Company's offer of two weeks severance because "I did not do anything wrong" and that "If I had done something wrong, I would have left." However, this Arbitrator was not convinced.

The fraudulent wire transfer took place on August 22, 2014 and the Grievant's testimony focused on each of his many purchases after that date including the loans he took out for those purchases and the sale of a house to explain some of the deposits. He bought a Harley, he traded in a Cadillac for another Cadillac, got a loan to buy a car for his wife, he traded for a pick up truck

and he bought a RV. The Grievant had a detailed explanation for each of his purchases and the Union asserted that though the Company cited $60,000 worth of unexplained deposits, the Union determined there were only $17,000 unexplained deposits.

In the opinion of this Arbitrator, whether it was $60,000 or one third of that amount, it was undisputed that there were unexplained deposits. Further, it was undisputed that the Grievant and his wife spoke multiple times every day; that during a period of time they were married; that during other times they were divorced and that they spoke daily even when they were divorced. Additionally, while the Grievant claimed that his wife only told him that her computer was hacked; that the money was sent to a foreign country and that she never told him that she made the transfer, he acknowledged that "what's hers is mine and what's mine is hers." Further, it cannot be emphasized enough that the Grievant admitted "we managed accounts jointly." Therefore, this decision is not based on the wife's testimony during her trial but rather based on the Grievant's actions before the termination and on his testimony at the arbitration hearing, which was not credible.

The Company asserted that it proved that the Grievant was complicit in the wire transfer in part because the Grievant and his wife spoke many times on the day of the fraudulent wire transfer. However, the Union countered with the argument that the telephone records for August 2014, C-4, only demonstrate that the Grievant and his wife spoke multiple times most days during these months and do not prove that he was complicit.

A full review of the telephone records before and after the fraudulent wire

transfer was revealing. On the days before the transfer there were 10, 17, 5, 11 calls respectively each day. Further, on August 22, 2014 there were seventeen (17) calls to the Grievant's phone, 617-320-2139, from his wife's cell phone and the Union asserted that these were the same number of calls the Grievant and his wife had on other days. However, when counting the calls before and after August 22, 2014, it was clear that there was only one other day, August 19, 2014, on which there were seventeen (17) calls and on some days, especially after August 22, 2014, there were as few as 0, 2, 3, 4 or 5 calls.

While this Arbitrator agrees with the Union that there is no way to know what the Grievant and his wife spoke about during those multiple daily calls, it does prove how close they were and how intermingled their lives were. Once again, the Grievant's unsolicited testimony that "what's hers is mine and what's mine is hers," was a very telling and damning comment. As the Grievant testified, his wife was very upset, her computer had just been hacked and all the passwords needed to be changed. However, it is just not credible, given their relationship and their joint back accounts, that during those multiple calls when his wife was so upset that she did not tell the Grievant before, on the day of, or on the days/months/years after about the fraudulent wire transfer.

The Company had the right to question where the money went and all the Grievant told the Company was that he did not do anything wrong. There was no place further to go with that denial. While the Company could have questioned the Grievant about each and every purchase he made, as was done at the hearing by the Union, the bottom line is that though there was no proof that the Grievant was involved in the actual fraudulent wire transfer, the record

established that he benefited from it and certainly did not tell the Company about the fraudulent wire transfer. This Arbitrator was not convinced that the Grievant did not know about the wire transfer until the verdict came down, as he testified.

This Arbitrator recognizes that theft is a very serious accusation but given all the testimony, this Arbitrator was convinced beyond a reasonable doubt that the Grievant knew about the fraudulent wire transfer, maybe not that day, but certainly in the following days and months and benefitted from the fraudulent wire transfer.

In conclusion, this Arbitrator has reviewed and carefully weighed all the evidence and arguments presented at the hearing and through closing briefs by both parties even though many facets were not referred to in the Opinion. Considering all the facts, this Arbitrator must decide that the matter is arbitrable and that the Company had just cause to terminate the Grievant.

In consonance with the proof and upon the foregoing, the undersigned Arbitrator hereby finds, decides, determines and renders the following:

# A W A R D

1.  The matter is arbitrable.

2.  The Employer had just cause to terminate the Grievant, Peter Gibson.

3.  The Grievance is denied.

_____
Mattye M. Gandel

Dated: May 23, 2018

State of New Jersey    )
                       :SS
County of Morris       )

    On the 23rd day of May 2018 before me personally came and appeared Mattye M. Gandel, to me known and known to me to be the person described herein who executed the foregoing instrument and she acknowledged to me that she executed the same.

_____
Notary Public

# A W A R D

1. The matter is arbitrable.

2. The Employer had just cause to terminate the Grievant, Peter Gibson.

3. The Grievance is denied.

_Mattye M. Gandel_
Mattye M. Gandel

Dated: May 23, 2018

State of New Jersey   )
                          :SS
County of Morris   )

On the 23rd day of May 2018 before me personally came and appeared Mattye M. Gandel, to me known and known to me to be the person described herein who executed the foregoing instrument and she acknowledged to me that she executed the same.

_____
Notary Public

MUSARRAT MOGHAL
Notary Public, State of New Jersey
My Commission Expires
January 20, 2022

23